SONIA FIGUEROA FERRER y ROBERTO MORALES MORALES, EX PARTE, peticionarios y apelados, *v.* ESTADO LIBRE ASOCIADO DE PUERTO RICO, interventor y apelante.

*Número:* O-77-230 *Resuelto:* 15 de mayo de 1978

252

*Héctor A. Colón Cruz, Procurador General,* y *Ricardo E. Alegría Pons, Procurador General Auxiliar,* abogados del interventor y apelante; *José Enrique Colón Santana, Salvador Tió, Luis A. Suárez Zayas, María Dolores Fernós, Elba Canales, Lirio C. Torres, Ana Matanzo, María Emilia Picó,* abogados de Servicios Legales de Puerto Rico, Inc. y de los peticionarios y apelados; *Lorenzo Muñoz Franco, Ernesto Meléndez Pérez, Luis Batista Zayas, Emmalind García* y *Evelyn Narváez, amici curiae,* los tres primeros defendieron la posición del interventor y apelante y las dos últimas la posición de los peticionarios y apelados.

EL JUEZ PRESIDENTE SEÑOR TRÍAS MONGE emitió la opinión del Tribunal.

El derecho a la intimidad, en proceso de desarrollo constante, abarca hoy ancho campo. Nos corresponde en este pleito

determinar su relación, así como la de otras garantías constitucionales, con la institución del divorcio.

Los peticionarios radicaron escrito en marzo de 1977 ante el Tribunal Superior en que expresan haber contraído matrimonio el 22 de enero de 1975. No han procreado hijos. Intentaron convivir como matrimonio, pero al presente consideran que éste ha perdido su propósito. Alegan finalmente que desean de común acuerdo disolver el vínculo que los ata, pero que no interesan "mentir ni entrar a discutir sus intimidades matrimoniales en el presente sistema de adversarios." Solicitan que este Tribunal "declare como una intromisión ilegal en la intimidad de los demandantes, las disposiciones estatutarias de la legislación de divorcio que obliguen [sic] a los demandantes a permanecer casados en contra de su libre, voluntaria y soberana voluntad y/o [sic] provocar una causal y/o [sic] engañar al Honorable Tribunal, a fin de disolver el vínculo legal que los une." Afirman que no está presente ninguna de las causales enumeradas en nuestra legislación.

El Tribunal Superior resolvió que no existe "base razonable para que el Estado ponga trabas al divorcio de las partes" en las circunstancias descritas y declaró nulas ciertas disposiciones del Código Civil. El Estado Libre Asociado, interventor, apeló el fallo. Alega el Estado en esencia que no procede el divorcio en nuestro ordenamiento jurídico bajo circunstancia alguna, si su base es el consentimiento mutuo de los cónyuges.

La solución de la controversia que plantea este recurso requiere el análisis de varias cuestiones. Debemos resolver en primer término si el procedimiento de sentencia declaratoria es utilizable en este caso. De ser utilizable, importa definir las disposiciones constitucionales en juego. Para impartirle contenido a éstas, dado su origen independiente, su condición dinámica y dimensión imprecisa, sería necesario repasar, en tercer término, el tratamiento del divorcio en otras

sociedades, tanto en las extrañas como en las similares a la nuestra. En último lugar es imprescindible que observemos el funcionamiento del estatuto vigente, su conexión con las realidades que vivimos y con los valores que entrañan las disposiciones constitucionales que con él conflijan. La disposición estatutaria a que nos referimos con mayor particularidad es la parte del Art. 97 del Código Civil, 31 L.P.R.A. sec. 331, que ordena:

". . . En ningún caso puede concederse el divorcio cuando la causa en que se funde sea el resultado de un convenio o confabulación entre marido y mujer o de una aquiescencia de cualquiera de ellos para conseguirlo." (1)

I

*La permisibilidad de acudir al procedimiento de sentencia declaratoria.*

El Art. 2 de nuestra Ley Uniforme de Sentencias Declaratorias, Ley Núm. 47 de 25 de abril de 1931, 32 L.P.R.A. sec. 2992, dispone:

"Toda persona . . . cuyos derechos, estado u otras relaciones jurídicas fuesen afectados por un estatuto, ordenanza municipal, contrato o franquicia, podrá obtener la determinación de cualquier divergencia acerca de la interpretación o validez de dichos estatutos, . . . y además que se dicte una declaración de los derechos, estados u otras relaciones jurídicas que de aquéllos se deriven."

■ Su Art. 11, 32 L.P.R.A. sec. 3001, ordena:

"Cuando se solicite un remedio declaratorio deberán incluirse como partes todas aquellas personas que tengan o aleguen tener algún interés que pueda ser afectado por la declaración . . . . En cualquier procedimiento en que se discuta . . . la anticonstitucionalidad de un estatuto, ordenanza, o franquicia, el Secretario de Justicia también deberá ser notificado con copia del procedimiento y tendrá derecho a ser oído."

---

(1) Consúltense también los Arts. 68 y 95 del Código Civil, 31 L.P.R.A. secs. 221 y 301.

Estas disposiciones son copia literal de las Secs. 2 y 11 de la ley uniforme estadounidense sobre este género de sentencias. 2 *Uniform Laws Annotated* 238, 516. Se cumplió en este pleito estrictamente con el mandato estatutario.

Los cónyuges recurridos son personas directamente afectadas en su relación matrimonial por las disposiciones impugnadas del Código Civil. El uso de la sentencia declaratoria para dilucidar cuestiones relativas al matrimonio y el divorcio está plenamente admitido. Borchard, *Declaratory Judgments*, 2d ed., Cleveland, 1941, págs. 264, 478 y ss.

Los peticionarios se atuvieron estrictamente a la letra del estatuto y notificaron al Secretario de Justicia el mismo día en que presentaron su escrito. Además lo emplazaron formalmente. El Secretario solicitó intervención después de dictarse sentencia y defendió la constitucionalidad del estatuto atacado. En este foro ha asumido también una posición adversativa frente a los peticionarios y no ha reclamado que sea improcedente el recurso de sentencia declaratoria. En varios foros se ha estimado que la notificación al Secretario es de índole jurisdiccional. *Parr* v. *Seattle*, 84 P.2d 375 (Wash. 1938); *Watson* v. *Washington Preferred Life Insurance Co.*, 502 P.2d 1016 (Wash. 1972). Si bien el estatuto no está enteramente libre de ambigüedad conforme a algunos, estimamos que el Secretario no tenía que ser parte formal en este procedimiento; podía limitar su papel al de interventor. Compárense: *Hydraulic Press Brick Co.* v. *City of Independence*, 311 N.E.2d 873 (Ohio 1974); *Developments in the Law —Declaratory Judgments*, 62 Harv. L. Rev. 787, 821 (1949); Borchard, *op. cit.*, 274; *Judicial Determinations in Nonadversary Proceedings*, 72 Harv. L. Rev. 723 (1959); *Ervin* v. *Taylor*, 66 So.2d 816 (Fla. 1953). Debe advertirse, además, que la conducta del interventor en este litigio le ha impartido un carácter tan adversativo como si hubiese comparecido como parte. La naturaleza adversaria de un pleito no puede supeditarse al escueto formulismo de las etiquetas empleadas.

El epígrafe de un caso no determina su naturaleza. Debe señalarse también que el derecho que este estatuto pudiese reconocer al Secretario de Justicia a ser parte formal en el epígrafe del caso es de índole renunciable. Véase: *Leonard* v. *City of Seattle*, 503 P.2d 741 (Wash. 1972), donde se adopta una norma aún más abarcadora.

## II

*Las cuestiones constitucionales envueltas.*

El Art. II, Sec. 8 de la Constitución del Estado Libre Asociado dispone:

"Toda persona tiene derecho a protección de la ley contra ataques abusivos a su honra, a su reputación y a su vida privada o familiar."

El Art. II, Sec. 1 expresa:

"La dignidad del ser humano es inviolable . . . ."

El informe rendido por la Comisión de Carta de Derechos a la Asamblea Constituyente señala la relación entre estas dos disposiciones:

"La protección contra ataques a la honra, reputación y vida privada constituye también un principio que complementa el concepto de la dignidad humana mantenido en esta constitución. Se trata de la inviolabilidad personal . . . y amplia . . . ." 4 *Diario de Sesiones de la Convención Constituyente* 2566.

En *E.L.A.* v. *Hermandad de Empleados*, 104 D.P.R. 436, 439–440 (1975), apuntamos que el derecho a la intimidad tiene un historial distinto en Puerto Rico al que tiene en Estados Unidos. Añadimos que nuestro Art. II, Sec. 8 es una copia literal del Art. V de la Declaración Americana de los Derechos y Deberes del Hombre y que entronca también con el Art. 12 de la Declaración Universal de los Derechos del Hombre. Recalcamos que nuestra Asamblea Constituyente quiso "formular una Carta de Derechos de factura más ancha

que la tradicional, que recogiese el sentir común de culturas diversas sobre nuevas categorías de derechos."

En *Cortés Portalatín* v. *Hau Colón*, 103 D.P.R. 734, 738 (1975), nos habíamos referido también a la amplitud del derecho a la intimidad. "Representando así esta sección [la número 8 del Art. II], como varias otras," afirmamos, "un principio con aspiraciones de universalidad, destilado de muy diversos sistemas jurídicos, ancho es el mundo que se nos brinda para su interpretación justa. No se está obligado por juegos específicos de reglas históricas. La obligación es acatar el mandato constitucional, en consonancia con otras disposiciones de nuestra ley primaria y las realidades del país."

El Art. II, Sec. 1 de nuestra Constitución ha recibido reconocimiento comparable. En *García Santiago* v. *Acosta*, 104 D.P.R. 321, 324 (1975), dijimos:

"En la sociedad democrática organizada alrededor de los derechos fundamentales del hombre, el Estado ha de reducir a un mínimo su intervención con sensitivas urdimbres emocionales como lo son las relaciones de familia. La intromisión en la vida privada solo ha de tolerarse cuando así lo requieran factores superantes de salud y seguridad públicas o el derecho a la vida y a la felicidad del ser humano afectado. No menos exige la Constitución del Estado Libre Asociado al declarar que la dignidad del ser humano es inviolable, y al condenar el discrimen por motivo de nacimiento, origen o condición social."

Véanse también: *Santiago de Hernández* v. *Tribunal Superior*, 102 D.P.R. 642 (1974); *Santiago* v. *Sears Roebuck*, 102 D.P.R. 515 (1974); *Pueblo* v. *Tribunal Superior*, 99 D.P.R. 30 (1970) (opinión concurrente de los Jueces Asociados Señores Rigau, Hernández Matos y Ramírez Bages); y *Loyo Colón* v. *Bargain Town*, 105 D.P.R. 331 (1976) (voto disidente del Juez Asociado Señor Irizarry Yunqué).

Conforme nuestra jurisprudencia, las Secs. 1 y 8 del Art. II de la Constitución del Estado Libre Asociado operan sin necesidad de ley que las implemente. *Alberio Quiñones* v. *E.L.A.*, 90 D.P.R. 812, 816 (1964); *E.L.A.* v. *Herman-*

*dad de Empleados,* 104 D.P.R. 436, 440 (1975). El derecho a la intimidad y la protección extendida a la dignidad del ser humano no son en nuestro ordenamiento entidades errantes en busca de autor o encasillado jurídico. La Constitución las consagra en textos claros.

La situación en Estados Unidos es distinta. No se ha determinado con exactitud la verdadera fuente del derecho a la intimidad. Este se ha derivado de la referencia a "libertad" en las cláusulas sobre el debido procedimiento de ley de la quinta y decimocuarta enmiendas a la Constitución de Estados Unidos, *Roe* v. *Wade,* 410 U.S. 113, 153 (1973); de la novena enmienda, Redlich, *Are There Certain Rights . . . Retained by the People?,* 37 N.Y.U.L. Rev. 782 (1962); *Griswold* v. *Connecticut,* 381 U.S. 479, 486–99 (1965) (opinión concurrente de Goldberg); de la cláusula sobre privilegios e inmunidades, *Doe* v. *Bolton,* 410 U.S. 179, 200 (1973); y de las emanaciones y penumbras de las primeras cinco enmiendas y el Preámbulo de la Constitución. Tribe, L. H., *American Constitutional Law,* The Foundation Press, 1978, pág. 893 y ss. Igual ocurre con el reconocimiento del carácter inviolable de la dignidad del ser humano (*personhood*). Tribe, *loc. cit.*

■ A pesar de lo incierto de su origen el derecho a la intimidad se desarrolló en Estados Unidos con gran pujanza. El artículo de Warren y Brandeis sobre el principio de "la personalidad inviolable" proveyó notable impulso. Warren & Brandeis, *The Right to Privacy,* 4 Harv. L. Rev. 193, 205 (1890). En su celebrada disidencia en *Olmstead* v. *United States,* 277 U.S. 438, 478 (1928), Brandeis se refirió al derecho a la intimidad como "the most comprehensive of rights and the right most valued by civilized men." En decisiones siguientes se fue reconociendo y expandiendo este derecho. En 1965 el Tribunal Supremo de los Estados Unidos lo utilizó para invalidar una ley estatal. *Griswold* v. *Connecticut,* 381 U.S. 479 (1965). En *Eisenstadt* v. *Baird,* 405 U.S. 438

(1972), se anuló un reglamento que discriminaba entre casados y solteros en cuanto al uso de contraceptivos. En *Carey* v. *Population Services International*, 431 U.S. 678 (1977), se invalidó una disposición estatal que prohibía la distribución comercial de contraceptivos. *Skinner* v. *Oklahoma*, 316 U.S. 535 (1942), dejó sin efecto un estatuto que ordenaba la esterilización de personas convictas dos o más veces de delitos graves que envolviesen depravación moral. En *Roe* v. *Wade*, 410 U.S. 113, 153 (1973), se resolvió que, dentro de determinadas circunstancias, "The right of privacy . . . is broad enough to encompass a woman's decision whether or not to terminate her pregnancy." Al mismo efecto: *Doe* v. *Bolton*, 410 U.S. 179 (1973).[2] Ambos casos establecen, junto a muchos otros, que el Estado no puede invadir la zona de la intimidad personal excepto para proteger intereses públicos apremiantes, *Roe*, supra, 154; *Planned Parenthood of Central Missouri* v. *Danforth*, 428 U.S. 52 (1976); *Boddie* v. *Connecticut*, 401 U.S. 371 (1971).

La jurisprudencia sobre los derechos a la intimidad y a la dignidad personal, particularmente sobre el primero, es hoy abundantísima. *Whalen* v. *Roe*, 429 U.S. 589 (1977); Comment, *A Taxonomy of Privacy: Repose, Sanctuary, and Intimate Decision*, 64 Calif. L. Rev. 1447 (1976); Tribe, *American Constitutional Law*, The Foundation Press, Inc., 1978, capítulo 15 ("Rights of Privacy and Personhood"). El derecho a la intimidad en Estados Unidos se aplica actualmente a situaciones muy diversas. Abarca, según se expresa en *Paul* v. *Davis*, 424 U.S. 693 (1976), "matters relating to marriage, procreation, contraception, family relationships, and child rearing and education." Según se ha ido enanchando por los tribunales el área de protección constitucional se ha ido achicando el poder de las asambleas legislativas

---

[2] Este Tribunal no se ha pronunciado, ni lo está haciendo aquí, sobre el impacto de *Roe* v. *Wade* y *Doe* v. *Bolton* en Puerto Rico.

para reglamentar muchos aspectos de estas materias. El desarrollo del derecho a la intimidad contradice la teoría, tan tradicional como equivocada, de que la decisión de los pleitos debe seguir canales incontaminados por la originalidad. Sobre las dificultades de esta teoría de adjudicación, véanse: Dworkin, R., *Taking Rights Seriously*, Harvard University Press, 1977, capítulo 4; Friedmann, *Legal Theory*, 5ª ed., Columbia Univ. Press, 1967, capítulo 32.

Tan amplio es el campo de estos derechos que han surgido serios problemas de clasificación. Gerety, *Redefining Privacy*, 12 Harv. Civ. Rights—Civ. Lib. L. Rev. 233 (1977); Comment, *A Taxonomy of Privacy* . . ., 64 Calif. L. Rev. 1447 (1976); Tribe, *op. cit.*, 887 y ss. Aparte de expresiones generales como la de *Paul* v. *Davis*, supra, el problema concreto en el caso de autos no ha sido objeto de análisis específico por las cortes estadounidenses.

Los derechos en cuestión han recibido en la doctrina, dentro y fuera de Estados Unidos, extenso reconocimiento también, pero abundan igualmente las generalizaciones. Autores como Maritain y Rommen estiman que la dignidad del ser humano es el más fundamental de los principios derivables de un derecho natural concebido al modo neoescolástico. Friedmann, *op. cit.*, 395. Machan ha escrito:

"The concept of human dignity should be one of the cornerstones of our legal system . . . .

"Generally, for a society to respect human dignity, the special moral relations between people should be left undisturbed. Government should confine itself to making sure that this voluntarism is not abridged, no matter how tempting it might be to use its coercive powers to attain some worthy goal . . . ."

Machan, *Human Dignity and the Law*, 26 De Paul L. Rev. 807, 819 (1977). En su catálogo de derechos humanos con aspiración de universalidad, McDougal y Lasswell son más específicos al condenar "unreasonable limitations on freedom to terminate uncongenial personal relationships" como obs-

táculo al derecho de todo ser humano a participar en los procesos afectivos. McDougal, Lasswell y Lung-Chu-Chen, *Human Rights and World Public Order: Human Rights in Comprehensive Context*, 72 Nw. U.L. Rev. 227, 235, 255 (1977).

En resumen, la inclusión de los derechos concernidos en la Declaración Universal de los Derechos del Hombre y en la Declaración Americana de los Derechos y Deberes del Hombre es índice de su rango. Estos derechos han evolucionado al grado suficiente para comprender ciertos aspectos de las relaciones familiares. Para precisar su conexión con el divorcio, para definir la zona de intimidad en este campo, así como la extensión del poder del Estado para invadirla, es indispensable, no obstante, contar con más datos. Examinemos en consecuencia el desarrollo de la institución del divorcio en otras sociedades y en la nuestra. El origen de nuestras cláusulas constitucionales sobre el derecho a la intimidad y a que se respete la dignidad del ser humano exige la amplitud de la búsqueda.

## III

*La institución del divorcio en otras sociedades.*

La institución del divorcio ha sufrido notables cambios a través de los tiempos. En la época del principado romano cualquiera de los cónyuges podía dar por terminado el matrimonio cuando lo desease. Con la extensión del Cristianismo se difundió el concepto de la indisolubilidad del matrimonio. Lutero, Zwingli y Calvino rechazaron el dogma de la indisolubilidad total, pero la Reforma ató la institución del divorcio al concepto de culpa y al sistema adversario. Especialmente a partir del siglo dieciocho el divorcio se fue generalizando y secularizando en las sociedades occidentales, pero continuó usualmente vinculado al concepto de la culpa. Tenía que haber un cónyuge inocente y otro culpable. El procedimiento tenía que ser adversativo. Excepto en Francia a raíz de la

Revolución de 1789, no se permitía el divorcio por consentimiento mutuo, es decir, sin insistencia en la culpabilidad del cónyuge demandado. Rheinstein, Max, *Marriage Stability, Divorce, and the Law*, Univ. of Chicago Press, 1972, capítulo 2. El divorcio sin culpa, tan generalizado hoy en muchas sociedades diversas, es una institución relativamente reciente en la mayoría de los países donde impera, aunque de vieja historia en otros. Representa hoy la teoría dominante.

En Europa, tan solo tres países no reconocen el divorcio actualmente: España, Irlanda y Andorra. Andrade Pires de Lima e De Matos Antunes Varela, *Código Civil Anotado*, vol. IV, Coímbra, 1975, pág. 578. En España, no obstante, el Art. 2 de la Ley de 2 de marzo de 1932, derogada en 1938, disponía que "Habrá lugar al divorcio cuando lo pidan ambos cónyuges de común acuerdo, o uno de ellos por algunas de las causas determinadas en esta Ley . . . ." La Gaceta, Madrid, 11 de marzo de 1932. Después de la revolución septembrina se permitió también el divorcio por la Ley Provisional de Matrimonio Civil de 18 de junio de 1870, 103 Colección Legislativa de España 848, 861, y el Reglamento para su ejecución de 13 de diciembre de 1870, 105 Colección Legislativa de España 908. Se derogó esta ley en tiempos de la Restauración. En Portugal y Liechtenstein se reconoce el divorcio, pero no entre católicos.

En Latinoamérica tan solo cuatro países rechazan el divorcio en alguna forma: Argentina, Brasil, Chile y Colombia. Alonso, H. y B., *La Separación Matrimonial*, Madrid, 1970, pág. 38. Hasta hace unos años el Paraguay se contaba en este grupo. Gallardo, *Divorcio, Separación de Cuerpos y Nulidad del Matrimonio en las Naciones Latino-Americanas*, Madrid, 1957.

En el resto del mundo el divorcio se prohíbe tan solo en Filipinas. Rheinstein, *op. cit.*, 8; Padilla, *Civil Code*, 1975, título IV, artículo 97 y ss.

El divorcio basado en criterios de culpa ha sido motivo de severos ataques desde considerable tiempo. Se ha señalado repetidamente que la insistencia en el concepto de culpa ha producido inexorablemente un lamentable distanciamiento entre el derecho escrito y el derecho en acción; que es común el perjurio y el irrespeto al mandato legislativo en este género de casos; que en la realidad el tipo de divorcio que prevalece es el divorcio por consentimiento, oculto tras la tambaleante fachada del divorcio por actos culposos o por ruptura irreparable del vínculo matrimonial. Rheinstein, *op. cit.*, 254–257, 311–313; Wadlington, *Divorce Without Fault Without Perjury*, 52 Va. L. Rev. 32, 81–84 (1966); Glendon, *The French Divorce Reform Law of 1976*, 24 Am. J. of Comp. Law 199, 204 (1976).

La inclusión de la separación por determinado tiempo entre las causales de divorcio representó un alivio al problema, aunque únicamente cuando el período de separación es breve (en algunas jurisdicciones norteamericanas el período de separación es de seis meses, 3 Fam. L. Rep. 4048–4049), pero generalmente se estima que este antiguo método no combate los males que desata la teoría del divorcio por culpa. Muchos países que intentaron este método han hallado que era imperativo liberalizar aún más su legislación sobre divorcio para lograr un justo equilibrio entre los delicados intereses envueltos en este asunto. Tal ha sido el caso de Suecia y otros países escandinavos y europeos. Sage, *Dissolution of the Family under Swedish Law*, 9 Family L.Q. 375, 376, 380 (1975); Rheinstein, *op. cit.*, 313; McCurdy, *Divorce—A Suggested Approach with Particular Reference to Dissolution for Living Separate and Apart*, 9 Vand. L. Rev. 685 (1956). Tal ha sido también la experiencia, como veremos dentro de breve, en la mayoría de las naciones latinoamericanas.

█ La introducción del concepto de ruptura irreparable del vínculo matrimonial como causal única o adicional del divorcio, conjuntamente con la abolición de defensas clásicas

a la acción, tales como la colusión y la connivencia, constituyó un método sutil para la aceptación parcial del consentimiento mutuo como método para la disolución del matrimonio. Suecia es un ejemplo típico del paso de un concepto a otro. Sage, *op. cit.*, 381–382.

A lo largo de todo este proceso se han efectuado estudios sobre la relación estadística entre la incidencia del divorcio y la relativa severidad de la ley. Se ha comprobado que los estatutos no avanzados de divorcio son ineficaces para reducir las disoluciones matrimoniales. Rheinstein, *Marriage, Stability, Divorce and the Law*, U. of Chi. Press, 1972, págs. 109, 406.

El divorcio fundamentado en nociones de culpa persiste hoy en sólo una minoría de países. Veamos la situación a grandes rasgos.

En Estados Unidos, de cuyo antiguo derecho proviene nuestra ley de divorcio, con su fuerte dependencia en el concepto de culpa y castigo, la tendencia ha sido a abolirlo, junto a las defensas que se derivan de él, tales como la colusión, la recriminación y la connivencia. Para el 1 de agosto de 1977 sólo tres estados de la Unión, Illinois, Pennsylvania y Dakota del Sur, se aferran, como Puerto Rico, a la desprestigiada teoría de la culpa como base para la concesión del divorcio. 3 Fam. L. Rep. 4047–4048. En treinta y un estados puede obtenerse el divorcio por ruptura irreparable del nexo matrimonial, como causal aparte de la de separación de los cónyuges por determinado período. 3 Fam. L. Rep. 4048. En cinco estados se reconoce abiertamente el divorcio por simple consentimiento mutuo. 3 Fam. L. Rep. 4099. Se ha cuestionado en la doctrina el poder del estado para denegar el divorcio por consentimiento mutuo. Berg, *Are Fault Requirements in Divorce Actions Unconstitutional?*, 16 J. of Fam. L. 265, 279 (1977–78).

El divorcio por consentimiento mutuo se admite, con ciertas condiciones en algunos casos, en la mayoría de los países

latinoamericanos. Existe en Bolivia, Cuba (antes y después de la revolución de 1959), Ecuador, El Salvador, Guatemala, Haití, Honduras, México, Nicaragua, Panamá, la República Dominicana y el Uruguay. Gallardo, *Divorcio, Separación de Cuerpos y Nulidad del Matrimonio en las Naciones Latino-Americanas*, Madrid, 1957. En Ecuador se adoptó el divorcio por consentimiento mutuo desde 1910, antes que en Rusia, aunque mucho después de la Francia revolucionaria. Haití, el primer país en reconocer el divorcio en la América Latina, introdujo el consentimiento mutuo como causal desde 1805. En Cuba se conoció desde la Ley Núm. 206 de 10 de mayo de 1934. Este tipo de divorcio no se ventilaba en una acción litigiosa. Se presentaba una petición conjunta, acompañada de los acuerdos pertinentes respecto a la guarda de los hijos y la disolución de la sociedad de gananciales. Se celebraba a los pocos días una vista de reconciliación. El Art. 50 del código cubano actual simplemente dispone que "Procederá el divorcio por mutuo acuerdo de los cónyuges, o cuando el Tribunal compruebe que existen causas de las que resulte que el matrimonio ha perdido su sentido para los esposos y para los hijos, y con ello también para la sociedad." El Segundo Congreso Jurídico Centro-Americano de 1901 influyó en la diseminación del divorcio por consentimiento en Latinoamérica. Gallardo, *op. cit.*, 311–312.

En Europa apenas quedan retazos de la noción del divorcio por culpa. Inglaterra es de las pocas naciones donde se ha liberalizado la ley y modernizado su lenguaje, mas donde todavía persiste en gran medida la influencia del espectro de la culpa. Existe allí una sola causal de divorcio, la ruptura irreparable del matrimonio, pero, contrario a la abrumadora mayoría de los países que han seguido este método, para probar dicha ruptura es indispensable demostrar la ocurrencia de actos básicamente equivalentes a las antiguas causales. *Divorce Reform Act 1969*, sec. 2, 40 Halsbury's Statutes of England 770–772. Se permite el divorcio por consentimiento

mutuo únicamente si ha mediado la separación previa por dos años. El sistema inglés ha sido objeto de dura crítica. Rheinstein, *op. cit.*, 317–352. Desarrollos recientes apuntan hacia una mayor liberalización. 3 Fam. L. Rep. 2387, 2622.

En Suecia evolucionó la institución del divorcio hasta aceptarse la disolución del matrimonio por consentimiento, sin las trabas que persisten en el derecho inglés. Bajo el Código Civil Sueco de 1920 se permitía este género de divorcio de considerarse que el matrimonio estaba deshecho. La reforma de 1973 acepta como regla general la decisión de las partes, proveyendo que "Si los cónyuges acuerdan disolver el matrimonio tienen derecho al divorcio." Tan solo en el caso en que medien hijos menores de dieciséis años bajo la custodia de un cónyuge no se permite el divorcio por consentimiento mutuo hasta expirado un plazo de reconsideración de seis meses. Sage, *Dissolution of the Family under Swedish Law*, 9 Family L.Q. 375, 380 (1975). El divorcio en el resto de Escandinavia es en extremo liberal. Rheinstein, *op. cit.*, capítulo 6.

En Bélgica se permite también, por ley de 20 de noviembre de 1969, el divorcio por consentimiento, pero las partes deben ser mayores de 23 años y el matrimonio debe haber durado dos. *Codes Belges*, Servais y Mechelynck, ed., t. 7°, suplemento (1 de enero de 1977).

La ley francesa de 11 de julio de 1975 se cuenta entre las más avanzadas. Se comenta extensamente su texto en III *Encyclopédie Dalloz*, 2ª ed., suplemento de 1977, "Divorce". La nueva ley (Art. 229 del Código Civil) reconoce tres tipos de divorcio: el divorcio por consentimiento mutuo, por ruptura de la vida común y por culpa. Existen dos clases de divorcio por consentimiento mutuo; cuando se radica una demanda conjunta por los esposos o una demanda por uno que es aceptada por el otro. La primera forma no puede utilizarse durante los primeros seis meses del matrimonio. No es necesario que las partes indiquen la causa del divorcio. Unica-

mente hay que someter al juez un proyecto de estipulación que reglamente todas las consecuencias del divorcio. El magistrado debe decretar el divorcio a menos que considere que la estipulación no representa la libre voluntad de las partes o que no protege adecuadamente los intereses de los hijos o los de alguna de las partes. En el otro tipo de divorcio por consentimiento puede interponerse la demanda aun en el caso de matrimonios jóvenes cuya duración no haya alcanzado los seis meses. Deben señalarse hechos que hagan intolerable la continuación del matrimonio, mas el juez no tiene que verificar su naturaleza. Basta con que la parte demandante los considere así.

En Suiza, Alemania Occidental y la gran mayoría de los otros países europeos la tendencia definitiva es hacia la superación del concepto de la culpa como única base para el divorcio. Seyboz & Gilliéron, *Code Civil Suisse et Code des Obligations Annotés*, Lausanne, 1972, Art. 137 *et seq.;* Rheinstein, *op. cit.*, capítulo 15.

El derecho soviético a partir de 1917 adoptó el principio del mutuo consentimiento. Bastaba con la simple decisión de las partes y su anotación en el registro civil o por el correspondiente tribunal del pueblo. Desde entonces, especialmente en 1924, 1936, 1944, 1949 y 1965–1968, ha habido variedad de cambios. La tendencia ha sido hacia la mayor participación del Estado y el énfasis en el concepto de la ruptura del vínculo matrimonial. Las causales para el divorcio no se enumeran y el carácter adversativo del procedimiento se ha eliminado. A partir de 1968 se limita la intervención de los tribunales a los casos contenciosos donde los cónyuges tengan hijos menores de edad. En los casos restantes es suficiente el simple registro de la voluntad de las partes, el cual adquiere finalidad al cabo de tres meses de solicitud al efecto. Rheinstein, *op. cit.*, capítulo 9; Berman, *Justice in the U.S.S.R.*, Harvard Univ. Press, 1963, págs. 338–344. Se ha comentado la gran similaridad de aspectos cardinales del de-

recho soviético y el californiano en la recepción del divorcio sin culpa. Se ha considerado que la herencia civilista común de ambos sistemas es causa importante de tal hecho. Bolas, *No-Fault Divorce: Born in the Soviet Union?*, 14 J. of Fam. L. 31, 65 (1975).

El concepto del divorcio sin culpa se ha extendido a otros continentes. El divorcio por consentimiento, sin necesidad de intervención de los tribunales, constituye, por ejemplo, el modo de obtener el 90% de los divorcios en el Japón. Rheinstein, *op. cit.*, 109 y ss. En Australia, por ley de 1975, la ruptura irreparable del vínculo matrimonial es la única causal de divorcio, aunque se requiere cierto término de separación. 3 Fam. L. Rep. 4041, 2250. En los países islámicos se reconoce la disolución del matrimonio por mutuo consentimiento. Amelunxen & Guenther, *Marriage and Women in Islamic Countries*, in Veenhoven, ed., *Case Studies on Human Rights and Fundamental Freedoms*, vol. 2, The Hague, 1975, pág. 85 y ss. En los países africanos no islámicos el movimiento hacia el reconocimiento del divorcio sin culpa y de la ruptura irreparable del matrimonio como causal determinante es evidente. Jackson, *The Law of Kenya*, Nairobi, 1970, págs. 42–45.

De lo anterior se desprenden varias conclusiones. El derecho a la intimidad ha influido decisivamente en el derecho de familia en múltiples culturas. Se discierne una tendencia general avasalladora a reconocer el divorcio sin culpa. Se han desarrollado diversos métodos de lograr este fin, bien mediante la institución de la causal de disolución por ruptura irreparable del matrimonio o la del consentimiento mutuo. En ambos casos la vasta mayoría de las jurisdicciones intenta escudar a las partes de la necesidad de depender de causales basadas en culpa o en la separación prolongada, así como de ventilar su vida íntima ante las cortes u otro foro. Si bien la experiencia cada vez más universalizada es expandir la zona de intimidad en el campo de las relaciones familiares es ad-

vertible también en la generalidad de las naciones una poderosa preocupación, expresada en formas diferentes, por la estabilidad de la familia, la debida guarda de los hijos y la protección de las partes en la división de sus bienes y en lo que respecta a su sustento. Examinemos estos principios a la luz de la realidad puertorriqueña.

## IV

*El divorcio en Puerto Rico.*

Puerto Rico es hoy una de las comunidades más rezagadas en el mundo en materia de legislación sobre divorcio. Nuestra legislación no ha podido superar la etapa del divorcio por culpa. Tan solo ha experimentado con el primer paso de liberalización ensayado en otros países, la separación por determinado tiempo. Art. 96(9) del Código Civil, 31 L.P.R.A. sec. 321(9). Los pasos subsiguientes, el divorcio por ruptura irreparable del vínculo matrimonial y la disolución del matrimonio por consentimiento, se han tomado en muchas otras comunidades cristianas, pero no aquí. Hemos sido renuentes a aceptar que el procedimiento de divorcio no tiene que ser siempre de naturaleza adversativa y que algunas barreras interpuestas a su obtención son ficticias e ineficaces.

El resultado ha sido la creación de un doloroso dilema para muchos seres humanos forzados a escoger entre hacer entrega de su derecho a la intimidad o convertirse en cómplices de una triste comedia para obtener el divorcio a tono con la "ley" y en burla de la ley. Es inevitable la brecha entre derecho y realidad en tales circunstancias. La verdadera situación en Puerto Rico es que existe *de facto* hace tiempo el divorcio por acuerdo mutuo. De lo que trata este caso simplemente es si, en aras del respeto debido a la dignidad e intimidad del ser humano y a la propia integridad de la ley y de los procesos judiciales, se debe reconocer formalmente lo que ya es realidad en nuestro país. *Informe sometido*

*al Consejo sobre la Reforma de la Justicia en Puerto Rico por el Comité Civil,* libro primero, 1975, págs. 103–109.'

Se viene criticando desde hace décadas el·deplorable estado de nuestra legislación en este campo. Nuestro fino humorista, Lic. Nemesio Canales, escribió en *Paliques:*

"Usted, señor mío, encontrará abiertas de par en par las puertas de una corte de justicia para solicitar y obtener la disolución del vínculo matrimonial, siempre que usted pueda alegar y probar a la faz de todo el mundo en juicio oral y público, que entre usted y su mujer ha ocurrido cualquiera de las ocho cosas espantosas que señala el código como motivo de divorcio.

Cualquiera de esas ocho cosas (eran 8 entonces)—adulterio, embriaguez habitual, trato cruel, etcétera—bien probadita, esto es, bien sacadita a la vergüenza pública, bien puesta de manifiesto una vez y otra vez ante los ojos curiosos del público, en los estrados de una corte, le dará a usted derecho a la sentencia de divorcio que desea. Pero, eso sí, tiene que haber lucha; tiene que haber una riña judicial en que ambos cónyuges se saquen los trapos al sol y traten de cubrirse del mayor oprobio posible; tiene que haber uno que quiera salir de la jaula conyugal y otro que le cierre el paso a todo trance; tiene que haber uno que diga sí y otro que grite no. Porque si tiene usted la desdicha de llegar pacíficamente, sin necesidad de escándalo, a un acuerdo o convenio mediante el cual ambos se declaren incapacitados para seguir la vida en común . . . ¡ya se ha fastidiado usted, y no hay divorcio!"

Citado más ampliamente en *Pueblo* v. *Tribunal Superior,* 99 D.P.R. 30, 41–42 (1970) (opinión concurrente de los Jueces Rigau, Hernández Matos y Ramírez Bages).

Al aprobarse en 1932 la ley española para permitir el divorcio por consentimiento mutuo, don Félix Ochoteco expresó:

"Jamás hemos visto mayor absurdo jurídico en nuestro legislador que el consignar la prohibición expresa de la ruptura del vínculo matrimonial por aquiescencia de los cónyuges . . . .

Repugnancia nos causa contemplar las comedias judiciales que se representan ante nuestros tribunales en gran número de acciones, en que las partes, e impulsadas por la imperativa exi-

gencia del estatuto, simulan una ausencia de confabulación, todo ello con el consiguiente ultraje a la dignidad de los juzgadores, y poniéndose de manifiesto un cínico relajamiento en la administración de justicia."

Ochoteco, *Comentarios a la Ley de Divorcio de la República Española en Relación con Nuestro Estatuto*, 4 Rev. Jur. U.P.R. 59, 71-72 (1934).

En la Conferencia Judicial de Puerto Rico, celebrada en 1958, el Comité sobre Relaciones de Familia y Delincuencia Juvenil explicó su sentir:

"El defecto principal en la actual Ley de Divorcio es que marido y mujer son litigantes adversarios; que uno debe ser declarado culpable y el otro debe ser declarado inocente; que el cónyuge culpable debe ser penalizado y el cónyuge inocente premiado. En el esfuerzo de cada uno por probar su inocencia y la culpabilidad del otro, se pierden respetabilidad y decencia y los procedimientos pueden producir penalidades desagradables. Si ambos resultan culpables, ninguno puede obtener sentencia a su favor y el matrimonio deberá continuar en toda su fuerza y vigor, no importa lo dañino que resulte para las partes, sus hijos, y la sociedad.

Una ley de divorcio debe estar orientada a promover la felicidad y no la infelicidad; a que los litigantes se conduzcan en forma amigable y no hostil; a que se mantenga la cohesión de la familia y no a que se precipite su destrucción; a que el remedio reclamado esté basado en el derecho propio y no en la culpa ajena. Cuando marido y mujer tengan que separarse permanentemente, debieran hacerlo sin las indignidades, hostilidades, dudas y agresiones que conllevan muchas de las acciones de divorcio. El bienestar de la familia, y especialmente el de los hijos, debe recibir primordial atención. Esta ley adopta un enfoque terapéutico del divorcio, y se inspira en el principio de que las cortes deben ser instrumento de ayuda para las partes y no arena de combate. La primera alegación de la parte promovente debe titularse 'petición' en vez de demanda y el título del caso debe ser 'In re: La Familia de —————', en vez de 'Fulano versus Zutano'."

En el citado informe de 1975 del Comité Civil del Consejo sobre la Reforma de la Justicia, según adoptado por el Consejo, se afirmó:

"[N]uestras leyes sobre el divorcio, por ejemplo, se hallan todavía en cierto estado de rezago histórico-social. Estas ya no responden a la realidad que vivimos . . . .

El área relativa al divorcio contiene un sinnúmero de mitos, resabios de antaño, prejuicios e intereses creados." (Págs. 103–104.)

El informe atacó el concepto de la culpa y recomendó "la instauración de una causal adicional de divorcio donde sólo se considere si existe el consentimiento mutuo de los cónyuges para terminar con el lazo matrimonial que los une." (Pág. 105.) Recalcó el informe el aspecto degradante del divorcio en Puerto Rico, añadiendo que en la situación presente

". . . algunos recurren a la mentira y al perjurio para obtener el divorcio, otros abandonan el hogar, dando por terminado todo vínculo familiar.

Por eso, entendemos que la creación de la nueva causal . . . es imperativa. El sistema actual, al limitar la accesibilidad del divorcio, hace que se empleen estratagemas indeseables para obtener el mismo, fomenta una doble moralidad, propulsa la formación de uniones ilícitas, constituye un mal ejemplo para la población en general y tiende a rebajar los patrones morales del pueblo, así como su confianza en los procesos judiciales." (Pág. 109.)

En encuesta celebrada por el Comité, el 82% de los abogados consultados expresó que aceptaría una causal de divorcio concebida en los siguientes términos:

"La incompatibilidad de carácter, el mutuo acuerdo o cualquier conducta continua de uno de los cónyuges que haga imposible una normal convivencia matrimonial." (Pág. 389.)

Antes y después de este informe se radicaron infructuosamente proyectos de ley ante nuestra Asamblea Legislativa para el reconocimiento del divorcio por acuerdo mutuo. Véanse: el P. de la C. 488 de la Sexta Asamblea Legislativa y el P. del S. 48 de la Octava.

Las estadísticas sobre el modo de obtener divorcios en Puerto Rico son de interés para observar el distanciamiento entre el derecho en los libros y el derecho en acción y el grado en que las partes intentan evitar los efectos de un procedimiento adversario. De los 13,876 casos de divorcio vistos por el Tribunal Superior durante el año fiscal pasado, tan solo 3,001 fueron de índole contenciosa. *Informe Anual de la Administración de los Tribunales*, 1976–77, Tabla B-16.

## V

*Conclusión*

En *Rosario* v. *Galarza*, 83 D.P.R. 167, 174 (1961) dijimos:

"No podemos condenar a la demandante a continuar un matrimonio ficticio. Nada ganaría con eso el interés general y por el contrario al hacer justicia como la entendemos nada pierde dicho interés público . . . .

Estamos mediando en un área eminentemente personal en que el ser humano tiene derecho a la menor intervención posible de parte del Estado y en la cual sólo debemos irrumpir cuando el interés general así lo justifique con claridad."

En ausencia de intereses públicos apremiantes el Estado no puede violar la zona de intimidad protegida por el Art. II, Sec. 8 de nuestra Constitución. Estimamos que es alta responsabilidad del Estado velar por la estabilidad de la familia, la guarda y cuidado de los hijos, la justa división de los bienes gananciales, la adecuada protección de las partes que disuelven su vínculo matrimonial. A nombre de estos intereses el Estado está impedido, no obstante, de obligar a dos seres humanos a permanecer atados cuando ambos reconocen que la convivencia entre ellos se ha hecho imposible. ¿Qué interés público existe en mantener un vínculo irremediablemente deshecho? ¿Qué interés social exige que como precio para obtener el divorcio las partes tengan que acordar fingir un pugilato legal, revelar detalles íntimos de su vida familiar

o acudir al perjurio y el engaño, en lesión de su dignidad y de la majestad de la ley?

 Las Secs. 1 y 8 del Art. II de la Constitución no permiten limitar los fundamentos del divorcio en Puerto Rico dentro de las circunstancias de este caso a causales derivadas del concepto de la culpa. Tales disposiciones constitucionales se basan en principios con aspiración de universalidad y la realidad predominante en el mundo de hoy, como hemos visto, es la aceptación del divorcio sin culpa. La Constitución del Estado Libre Asociado ampara el derecho de los puertorriqueños a proteger su dignidad y vida íntima en los procedimientos de divorcio mediante la expresión de la mutua decisión de divorciarse o la consignación de ruptura irreparable de los nexos de convivencia matrimonial. No tienen que mediar partes adversas; puede hacerse por petición conjunta de los cónyuges. No tiene que existir una parte inocente y otra culpable. La esencia del derecho estriba en la abolición de la noción de culpa. No necesitan las partes expresar las razones de su decisión si a su juicio ello conlleva la revelación indeseada de penosos detalles de su vida íntima. No puede forzarse a las partes a vivir ininterrumpidamente separados por dos años como único medio de ejercer su derecho a la intimidad y la inviolabilidad de su dignidad humana. Esta es una causal legítima para quienes deseen invocarla pero, según hemos advertido, ella representa tan solo una etapa intermedia, primitiva e incompleta de la evolución del divorcio culposo al divorcio sin culpa.

 Nada de lo anterior significa que el divorcio es asunto exclusivo de las partes, sujeto a su puro capricho y antojo. El Estado puede y debe cerciorarse de que la decisión de solicitar conjuntamente la disolución del vínculo matrimonial no es producto de la irreflexión o de la coacción. Los tribunales interrogarán a las partes sobre estos particulares. Como medida adicional que tienda a garantizar que ha mediado la

debida deliberación no se aceptará petición alguna de divorcio bajo los principios enunciados sin que las partes adjunten las estipulaciones correspondientes sobre la división de sus bienes, el sustento de las partes y otras consecuencias del divorcio. El tribunal no concederá el divorcio si a su entender alguna de las partes no habrá de recibir protección adecuada.

██ Hasta que la Asamblea Legislativa opte, dentro del esquema constitucional vigente, por prescribir otras normas tendentes a garantizar que la decisión de disolución conyugal por mutuo acuerdo no es hija de la irreflexión, los tribunales no admitirán renuncias al término para solicitar revisión y la petición de divorcio podrá retirarse en cualquier momento antes que la sentencia se convierta en final y firme. La Asamblea Legislativa puede erigir otras salvaguardas razonables para defender debidamente la estabilidad de la familia, siempre que no viole los derechos ilegislables que protegen las Secs. 1 y 8 del Art. II. Pueden establecerse, dentro de dichos parámetros, mecanismos de conciliación, términos mínimos de duración del matrimonio para la interposición de la acción en determinados casos y tomarse otras medidas fundadas en intereses apremiantes del Estado.

Ya que en este caso no median hijos no hacemos pronunciamiento alguno sobre la medida, si alguna, en que debe variar el análisis aquí hecho de ser otras las circunstancias de la controversia.

██ Por último, valga señalar que no es posible eludir la tarea emprendida aquí mediante el argumento de que todo lo concerniente al divorcio debe ser asunto a resolverse por la Asamblea Legislativa. Según expresamos en *Santa Aponte* v. *Srio. del Senado*, 105 D.P.R. 750 (1977), la función de interpretar la Constitución es atributo indelegable de la Rama Judicial. Es a los tribunales que les corresponde fijar el significado de las disposiciones constitucionales envueltas aquí. Competería por entero la reglamentación de esta materia a la

Rama Legislativa únicamente si resolviéramos que este Tribunal es impotente bajo la Constitución para proteger el derecho a la intimidad de los ciudadanos de este país en este aspecto de las relaciones familiares; que carece igualmente de poder para impedir la degradación a que a menudo se fuerza a los cónyuges bajo la situación imperante; y que su papel no puede rebasar al del simple espectador limitado a lo sumo a lamentar el desprestigio que sufre necesariamente un sistema jurídico divorciado de la realidad a la que se supone que sirva. Es cierto que los cambios reseñados en el concepto del divorcio en diversos países se han llevado a cabo mediante legislación, mas esto ha ocurrido en circunstancias diferentes a las nuestras. En tales naciones ocurre que el poder judicial desempeña un papel distinto al que nuestra sociedad le asigna o que los textos constitucionales a interpretarse son dispares y carecen del elemento de aspiración universal que anima nuestro estatuto orgánico. En buena teoría de adjudicación, además, los parlamentos no son los únicos agentes de cambios sociales necesarios. Cuando se trata de mantener vivo un esquema constitucional, de conservarlo en buena sintonía con las realidades del país, es principal deber de la judicatura propender igualmente a tal fin, aunque con la mesura y circunspección que le impone su papel dentro de nuestro sistema de gobierno y sin exceder el marco de sus atribuciones.

 Por las razones señaladas *declaramos inconstitucionales la parte citada del Art. 97 del Código Civil y otras disposiciones opuestas a los principios aquí consignados. Sujeto a las modificaciones derivables de esta opinión, se confirma la sentencia apelada.*

El Juez Asociado Señor Negrón García concurre en opinión separada. El Juez Asociado Señor Díaz Cruz emitió opinión disidente, con la cual concurre el Juez Asociado Señor Martín, quien se reserva el derecho a emitir posteriormente un voto particular.

—O—

Opinión concurrente del Juez Asociado Señor Negrón García.
San Juan, Puerto Rico, a 15 de mayo de 1978

Al plasmar separadamente nuestra conciencia judicial
sobre un asunto tan complejo, sensitivo y volátil, estimamos
de rigor consignar las siguientes reflexiones mínimas.

## I

Concebimos el divorcio como un remedio extremo para
situaciones extremas; como regla general no lo favorecemos.
Nos preocupa sobremanera su alta incidencia en el país. No
estamos ajenos e insensibles a la magnitud del problema pues
en más de una década dedicada a administrar la justicia en
todos los niveles, hemos sido testigos de las múltiples conse-
cuencias y efectos negativos que conlleva. En las estadísticas
anuales de matrimonios fracasados, más que simples cómpu-
tos aritméticos, somos de los que directamente hemos visto
cuadros conmovedores del dolor y la tragedia humana, tanto
pasajera como permanentemente, de miles de adultos e hijos
y las serias complicaciones generadas imposibles de enumerar
y predecir.

Aunque en apariencia algunos casos sean muestra de lo
contrario, la experiencia indica que el divorcio, de ordinario,
no es producto de una combustión instantánea. Representa
una decisión individual o mancomunada resultante de la
combinación de un sinnúmero de factores que van acumulán-
dose con el tiempo deteriorando con mayor o menor celeridad
el nexo nupcial. Aun cuando puede ser de conocimiento pú-
blico las razones son básicamente personales y privadas. Al-
gunas veces el curso de acción es anticipable por uno o ambos
cónyuges y el círculo familiar o de amigos; y en otras, es una
sorpresa inexplicable para todos. En muchas ocasiones la de-
cisión es adoptada después de una deliberación profunda y de
agotarse una serie de medidas tendentes a evitarlo, y en otras

no. En la mayoría de los casos en que se obtiene algún asesoramiento de tipo profesional y objetivo, la recomendación habrá de ser la tramitación de un divorcio en la forma más sabia, humana y menos tormentosa posible, esto es, la resolución mutua de finalizar la unión. En este sentido, rechazamos la errónea noción de que los tribunales "divorcian". En su correcta perspectiva los foros judiciales no disuelven ningún matrimonio, sino que decretan y reconocen oficialmente, *a posteriori*, la terminación de una relación humana en escombros quebrantada extrajudicialmente con anterioridad.

Advertimos también, que las leyes sobre divorcio representan un eterno conflicto con el ideal que compartimos de una unidad familiar imperecedera; con la santidad del contrato marital y la existencia de una válvula de escape cuando la relación se torna intolerable; entre una deseada estabilidad y la inestabilidad resultante de la incompatibilidad; y entre el interés comunitario de proteger a los hijos—víctimas inocentes de hogares rotos—y el evitarles el daño proveniente de criarse y educarse en un ambiente de hostilidad de sus progenitores.

Ciertamente no abona a la solución del problema la impresión equivocada de lo que es una relación matrimonial. No es posible reducirla a la perpetuidad de un idilio romántico. Debido a su proximidad, son inevitables las fricciones y discrepancias; las angustias y regocijos del criar hijos; y la superación de problemas económicos y de otras índoles, consecuencias de afrontar diariamente las complejidades de una vida rutinaria y moderna. No existen soluciones simples. Ahora bien, una mejor comprensión de lo que es vida marital y familiar—a través de la educación y el ejemplo—constituye uno de los enfoques más efectivos para evitar y prevenir el divorcio. Reciprocidad en paciencia, tolerancia, buena fe, confianza, fe espiritual y afecto entre sus miembros son elementos indispensables para su sostenimiento. En última instancia creemos que su solidez o fragilidad no guarda correspon-

dencia con la existencia de un mayor o menor número de causales de divorcio. Si se pierden los factores enumerados, la crisis y desmembramiento de la unión sobrevendrá independientemente de las causales estatuidas en el Código Civil y de que los tribunales oficialmente lo reconozcan.

Aun cuando lo contemplemos a través de prismas muy diferentes, en todas sus etapas, matrimonio, tanto moral como jurídicamente, ha de significar unión, intimidad y aproximación física, emocional y espiritual entre un hombre y una mujer. En su visión universal y sentido más profundo difícilmente puede concebirse una relación privada de dimensiones más estrechas y sensibles.

## II

Nuestra misión de adjudicar con absoluta ecuanimidad toda controversia legal nos obliga a descartar las preferencias personales y evaluar con neutralidad jurídica el planteamiento de inconstitucionalidad. Veamos. En nuestra sociedad democrática, el Estado no tiene jurisdicción sobre los dictados de conciencia y sentimientos individuales del ser humano. Solamente cuando los pensamientos y emociones salen del mundo interior de las ideas y se exteriorizan o traducen en acciones que directa o indirectamente afectan perjudicialmente a otros individuos, se acepta su participación. Como consecuencia, su intervención en el ámbito familiar ha de ser mínima, limitada a lo estrictamente necesario y en virtud de un interés apremiante. Precisamente por ello, la institución jurídica del matrimonio—cuya importancia y estabilidad pública es incuestionable—en las áreas de su celebración, régimen y disolución, están sujetas a reglamentación razonable, salvaguardando en lo posible a sus integrantes los derechos de libertad, igualdad e intimidad que les consagra nuestra Ley Fundamental.[1]

---

[1] Carta de Derechos de la Constitución del Estado Libre Asociado de Puerto Rico, Art. II.

El derecho vigente nos informa que la causal de separación ininterrumpida de ambos cónyuges proyecta dos modalidades: la separación por decisión individual y exclusiva de uno de los cónyuges y aquella basada en la determinación bilateral como consecuencia de mutuo convenio de así hacerlo. *Godreau* v. *Guerrero*, 68 D.P.R. 88, 89 (1948); *Simonet* v. *Sandoval*, 63 D.P.R. 523, 526 (1944); y *Núñez* v. *López*, 62 D.P.R. 567, 573 (1943). Salvo esta causal, hemos de reconocer que nuestra legislación sobre motivos de disolubilidad conyugal ha permanecido cristalizada, petrificada y atada al antiguo concepto retributivo de "culpa", el cual se nutre del sistema de litigación de adversario y se erige sobre unas bases irreales en el terreno de las relaciones humanas afectivas, dinámica de hechos sociales y adjudicación de controversias judiciales. Al presente, cuando en la zozobra conyugal marido y mujer acuden ante el foro judicial buscando un remedio, el proceso de ley prevaleciente sólo lo viabiliza en virtud de determinar la "culpa". Este criterio en la práctica tiende a aumentar la tirantez y animosidad envolviéndolos en una mayor amargura. Excepto el camino de una separación convenida por dos (2) años impuesta legislativamente, carecen de un paliativo decoroso y humano de menor plazo. La orfandad en remedios es evidente para todos: al implementarse la búsqueda del desagravio, éste se torna en agravio hacia uno o ambos cónyuges, exacerbándose las ofensas. Ello debe evitarse. Tal vía sólo conduce a añadir indignidad a la tragedia de un amor y unión fracasados. (²)

Opinamos que cuando lamentablemente desaparecen toda la gama de factores biosicológicos que cimentan la rela-

---

(²) Para el jurista, es una tarea casi imposible reducir a una fórmula científica toda la complejidad y magnitud del sentimiento denominado amor, como compendio de las afecciones humanas elevadas, y los fenómenos de hostilidad, odio e incomprensión que como antítesis en ocasiones puede generar.

ción([3]) marital, y los cónyuges conscientemente y con ánimo prevenido así lo aceptan, la raíz, integridad y juridicidad del lazo nupcial no puede sostenerse por la ficción temporal del término irrazonable de dos años en orden al interés legítimo que en su estabilidad tiene el Estado. No existe justificación valedera para requerir un período de tiempo tan extenso, mientras por otro lado la causal de "abandono" estatuida, sólo exige un (1) año de distanciamiento acompañado de la circunstancia demostrativa de la voluntad decidida y firme de uno de los cónyuges de separarse definitivamente del otro y romper el vínculo matrimonial (nolición). *Iturrino* v. *Figueroa*, 61 D.P.R. 184 (1942). ¿Cómo admitirse racionalmente la rotura conyugal por decisión de uno abandonando al otro durante un (1) año, y negarla cuando ambos coinciden, compeliéndolos a una espera de dos (2) años? Sostener la solidez del nexo nupcial en virtud del mandato legal que exige dos (2) años de absoluta "separación" es un contrasentido por no decir eufemismo. ¿Por qué el Estado abstraerse de esta realidad y como única alternativa inyectar el ingrediente de "culpa" y forzar a dos seres humanos a acudir como opositores a los tribunales a ventilar aspectos íntimos de la vida marital? La disyuntiva equivale a obligar a uno el aceptar convertirse, ficticia o realmente, en "culpable" como medio seguro de obtener ambos, antes de dicho término, el remedio deseado. El producto neto es proclamarle innecesariamente, en sus exequias matrimoniales, reo convicto de sus defectos y flaquezas privadas mediante proceso contencioso o en rebeldía y documento público judicial. Una ley humana hecha para seres humanos no puede tolerar acto tan inhumano.

---

([3]) Al examinar las causales de divorcio establecidas en el Art. 96 del Código Civil (31 L.P.R.A. sec. 321) nos percatamos que todas convergen al reconocimiento de situaciones que de una forma u otra destruyen aquellos elementos síquicos-físicos afines que sostienen el matrimonio.

## III

Al ponderar estas interrogantes siguiendo la fórmula analítica "de estricta supervisión judicial"—*Zachry International* v. *Tribunal Superior*, 104 D.P.R. 267 (1975)—obtenemos como contestación que constitucionalmente la situación no puede prevalecer. En su aplicación el diseño legislativo actual es fatalmente defectuoso, incompleto y legalmente impermisible. En estas circunstancias, el llenar e interpretar la laguna existente es función rectora por excelencia de este Tribunal, aunque voces autorizadas y respetadas lo tachen de indebida legislación judicial. *Ocasio* v. *Díaz*, 88 D.P.R. 676 (1963).

Recapitulando, la nota de formalidad y legalidad para que el matrimonio se constituya como institución jurídica afecta más a la forma que a su esencia. En su elevada categoría contractual, el consentimiento bilateral en sustancia es la clave tanto para su celebración y consumación legal como también para su continuación o terminación. No vemos fundamento válido para una vez transcurrido un período de tiempo razonable, indicativo de una firme y deliberada voluntad de los cónyuges,[4] el Estado niegue su disolución por

---

[4] Dependiendo de la existencia o no de hijos menores de edad, plazos que oscilan entre uno (1) a seis (6) meses desde que los cónyuges radican la petición de divorcio por consentimiento mutuo, constituyen términos que superan los reparos constitucionales esbozados en esta ponencia y *prima facie* representarían una reglamentación válida del Estado. Obviamente corresponde a la Asamblea Legislativa reglar específicamente la cuestión.

Para la solución del caso de autos, el tiempo transcurrido desde que los peticionarios radicaron su petición ante la sala de origen al momento de nuestra decisión, evidencia la intención reiterada de adoptar dicho curso de acción, lo que satisface a cabalidad cualquier preocupación al respecto.

Tampoco se plantea problema respecto al requisito jurisdiccional de residencia, ya que éstos estaban domiciliados en Puerto Rico un año antes de incoarse la acción. La validez extraterritorial de divorcios por mutuo consentimiento dependerá de la observancia estricta del requisito jurisdiccional de un (1) año. Véanse: *Prawl* v. *Lafita Delfín*, 100 D.P.R. 35 (1971); *González Miranda* v. *Santiago*, 84 D.P.R. 380 (1962); *Mestre* v. *Pabeyón*, 84 D.P.R. 369 (1962).

acuerdo de mutuo disenso, exigiendo a cambio la realización y repetición de un drama traumático de dolor y tragedia para los protagonistas, mediante una previa incursión investigativa[5] y expositiva sobre detalles mortificantes de desavenencias y discordias habidas—reales o imaginarias—en la vida íntima y privada de los cónyuges. Por su escasa contribución a restaurar positivamente la armonía y estimación recíproca conyugal ya quebrada y crear artificialmente adversarios en un aspecto donde no hay debate forense ni conflicto, el dilucidar y demostrar en ese momento tales hechos, resulta una intromisión irrelevante, innecesaria e injustificada, amén de ser atentatoria a la dignidad del ser humano y al respeto de sus interioridades personales.

—O—

Opinión disidente del Juez Asociado Señor Díaz Cruz con la cual concurre el Juez Asociado Señor Martín.

San Juan, Puerto Rico, a 15 de mayo de 1978

Un juez superior de la Sala de Caguas habiendo determinado que los cónyuges que ante él pedían divorcio por mutuo consentimiento, carecían de causa de acción para invocar alguna de las razones enumeradas en el Art. 96 del Código Civil (31 L.P.R.A. sec. 321), decidió que el Estado no podía coartar el deseo expresado por la pareja, y consecuentemente decretó la ruptura del vínculo matrimonial, de paso declarando inconstitucional el citado Art. 96. Intervino el Procurador General para sostener la validez de la ley, según autoriza la Ley Núm. 451 de 14 mayo, 1952 (32 L.P.R.A. sec.

---

[5] Claro está, en adición a la comprobación de la libre voluntad de éstos y la imposición de ciertos requisitos relativos a bienes e hijos menores de edad—patria potestad, tutela, pensión alimenticia y otros—en que la libertad individual tiene poca beligerancia por no depender de la voluntad, sino de los imperativos naturales de haber las personas constituido, sea de "facto o de jure", un núcleo familiar.

353) (¹) y hemos considerado su alegato, así como el de la parte apelada; y el de la Federación de Mujeres Puertorriqueñas y el de los abogados Sres. Muñoz Franco, Meléndez Pérez y Batista Salas como *amicus curiae*. Procedemos a resolver la cuestión que es de complicada sencillez.

El poder legislativo se ejercerá por una Asamblea Legislativa, que se compondrá de dos Cámaras—el Senado y la Cámara de Representantes—cuyos miembros serán elegidos por votación directa en cada elección general. Constitución del Estado Libre Asociado de Puerto Rico, Art. III, Sec. 1ª. En audaz e impermisible invasión del campo legislativo, la opinión de mayoría deroga los Arts. 68, 95 y 97 del Código Civil regulativos del divorcio en nuestro país, mutila la institución civil del matrimonio y crea una nueva causal de divorcio fundada en el mutuo consentimiento. En la obra de génesis, olvida el orden procesal, deja a la pura imaginación de cada sala de justicia escoger la manera en que sin herir en lo más mínimo el derecho de intimidad de los cónyuges se constituirán en obedientes servidores de la voluntad de las partes, despachando decretos de divorcio sobre el mostrador y al instante. La falta de respetabilidad y juridicidad en tales sentencias de "divorcio íntimo" es tan evidente que no merecerían la plena fe y crédito que el Art. IV, Sec. 1 de la Constitución de los EE. UU. ordena para los procedimientos judi-

---

(¹) Sec. 353. *Intervención en casos en que esté envuelta la constitucionalidad de una ley*

"Siempre que la constitucionalidad de una ley o parte de una ley de Puerto Rico sea impugnada en una corte o tribunal de Puerto Rico, a través de cualquier acción, litigio o procedimiento, la corte o tribunal o cualquier litigante en el procedimiento notificará dicha impugnación al Secretario de Justicia cuando el Estado Libre Asociado de Puerto Rico no sea parte, y permitirá que el Estado Libre Asociado de Puerto Rico intervenga como parte, únicamente en lo relativo al aspecto de la constitucionalidad de dicha ley y para sostener la validez de la misma. El Secretario de Justicia estará autorizado para comparecer a nombre del Estado Libre Asociado de Puerto Rico."

ciales de otros estados; como quedaría contrahecho el estatuto personal([2]) de los puertorriqueños afectados por estos divorcios a la orden sin reconocimiento en la esfera del derecho internacional privado. La opinión de mayoría es una cruda abrogación de poderes constitucionales que le corresponden a la Rama Legislativa. *In re Rodríguez Torres* (En reconsideración), 106 D.P.R. 698 (1978).

El producto de esta opinión tiene un origen visible en eufórica exaltación del derecho a la vida íntima, con entera abstracción de los altos valores éticos, morales y sociales de la institución del matrimonio. Aplica unos principios prevalentes en comunidades de moral y costumbres distintas a las nuestras y con ese instrumento foráneo poda y cercena el Código Civil y de paso le añade una décima causal de divorcio. Labor de audacia, si observamos que aún en aquellas jurisdicciones norteamericanas donde existe la causal de mutuo consentimiento ésta ha llegado a los estatutos por el cauce constitucional de las Legislaturas de los estados, a pesar de que fue en su seno que nació y se desarrolló la doctrina sobre el derecho de intimidad, por nosotros adoptada en las Secs. 8 y 1 del Art. II de la Constitución. Tampoco hay precedente contrario en el concierto de naciones que han acogido esta causal basada en la desintegración o inoperancia (*breakdown*) del matrimonio por acción de sus parlamentos. Hasta donde sabemos somos los únicos que en asunto tan saturado de política pú-

---

([2]) Art. 9 del Código Civil, 31 L.P.R.A. sec. 9.

"Las leyes relativas a los derechos y deberes de familia, o al estado, condición y capacidad legal de las personas, obligan a los ciudadanos de Puerto Rico, aunque residan en países extranjeros."

Art. 11, Código Civil, 31 L.P.R.A. sec. 11.

". . . las leyes prohibitivas concernientes a las personas, sus actos o sus bienes, y las que tienen por objeto el orden público, y las buenas costumbres, no quedarán sin efecto por leyes o sentencias dictadas, ni por disposiciones o convenciones acordadas en países extranjeros."

blica e interés preponderante del Estado, de auténtica factura estatutaria, ocupamos el campo de la Asamblea Legislativa. Para ello hemos desoído nuestra propia jurisprudencia: [3] Es principio de derecho internacional privado, admitido por la jurisprudencia de los tribunales y especialmente sancionado por el artículo 9 del Código Civil, que la ley personal del individuo es la del país a que pertenece, la que le sigue donde quiera que se traslade, regulando sus derechos personales, su capacidad para trasmitir por actos *inter vivos* y *mortis causa* y el régimen de su matrimonio y familia. Las leyes relativas a los derechos y deberes de familia, o del estado, condición y capacidad legal de las personas, obligan a los ciudadanos de Puerto Rico, aunque residan en países extranjeros, y este precepto del Código Civil, es aplicable, por analogía, a los ciudadanos de cualquier Estado, residentes, habitual o temporalmente, en Puerto Rico. *Cf. Antongiorgi* v. *El Regis. de la Prop.*, 6 D.P.R. 239, 242 (1904); "El estado civil de los ciudadanos debe regirse en todo por la ley de su país y solo puede determinarse con arreglo a ella." *Orama* v. *Oyanguren*, 19 D.P.R. 828, 831 (1913). "Las leyes del Estado donde se contrae el matrimonio son las que regulan los derechos y deberes entre los esposos, principio que también establece nuestro Código Civil en su artículo 9 para los ciudadanos de Puerto Rico, aunque residan en países extranjeros, y el hecho de adquirir bienes inmuebles en un Estado donde se reconoce la sociedad de gananciales entre los esposos no crea entre ellos esa sociedad si en el Estado donde se casaron no existe." *Bartholomew* v. *Allen et al.*, 24 D.P.R. 370, 372 (1916), confirmado en *Cothran* v. *Registrador*, 25 D.P.R. 646, 648 (1917).

---

[3] Nuestra jurisprudencia está predicada sobre los principios de debido proceso de ley y moral y orden público que gobiernan el mutuo respeto en el campo del Derecho Internacional privado y que el Título Preliminar del Código Civil recoge en el Art. 11, párrafo 3, *supra*.

# I

## NATURALEZA DE LA INSTITUCIÓN MATRIMONIAL

Declara y ordena el Art. 68 de nuestro Código Civil (31 L.P.R.A. sec. 221):

"El matrimonio es una institución civil que procede de un contrato civil en virtud del cual un hombre y una mujer se obligan mutuamente a ser esposo y esposa, y a cumplir el uno para con el otro los deberes que la ley les impone. Será válido solamente cuando se celebre y solemnice con arreglo a las prescripciones de aquélla, y sólo podrá disolverse antes de la muerte de cualquiera de los dos cónyuges, en los casos expresamente previstos en este título."

La premisa esencial de honor y dignidad moral de los sexos en el matrimonio es el pensamiento de su perpetuidad. Los que preconizan su disolución por recíproca repudiación tratan de imponer a esta institución un régimen de fragilidad e inestabilidad que ni siquiera se da en los contratos, porque aún en éstos la actuación de la voluntad, restringida por el interés social y el orden público, no están enteramente libres las partes para imponer el resultado apetecido. El Estado es siempre *parte* en todos los matrimonios. Si se reconocen límites a la libertad del individuo aun en la contratación privada de orden exclusivamente patrimonial, no pueden ignorarse tales restricciones dictadas por el interés del Estado en la estabilidad del matrimonio como garantía por excelencia de la protección y educación de los hijos.

El matrimonio, sin embargo, no puede definirse por características propias del contrato. Es propiamente una *institución*, como la llama el Art. 68, a la que los contrayentes simplemente prestan su adhesión terminando allí el libre ejercicio de su voluntad y comenzando los efectos jurídicos de la institución. "La obra de la reproducción humana, en su más pleno sentido, o, lo que es igual, la formación físico-espiritual

de los hijos, exige una colaboración constante, una acción combinada y armónica de los dos padres, de todo punto incompatible con el relajamiento del vínculo que el divorcio supondría." Castán Tobeñas, *Derecho Civil Español*, Tomo 5°, Vol. 1°, pág. 76, Octava Edición (1960). El matrimonio es logro de la civilización cuyo contenido ético, afirmado en el devenir de la historia por una síntesis de moral y religión, no debe sufrir detrimento de legislación laxa y disolvente, ni mucho menos de voluntad caprichosa de las partes. Ese contenido de dignidad no está al alcance de la simple voluntad de los contrayentes al que han de aspirar y admitirlo de la manera y con la solemnidad que ordena la ley. Está igualmente fuera del alcance de las partes su disolución por reglas de contratos como la resolución por mutuo disenso. Quien no estime la dignidad esencial del matrimonio, porque lastima su intocable albedrío está enteramente libre para buscarse un compañero de unión consensual de quien podrá prescindir en cualquier momento como artículo desechable. ([4]) No puede, sin embargo, tomar la institución del matrimonio como parapeto de su liviandad. Las instituciones demandan una lealtad y una sinceridad de propósitos de sus adherentes que están muy por encima del anárquico ejercicio de la voluntad. La institución del matrimonio "significa para todos un sistema de vinculaciones jurídicas preestablecidas en orden a una finalidad y públicamente conocidas, al que libérrimamente prestan su adhesión las personas capaces de ello, obligándose a su cumplimiento respecto al copartícipe cuya libre elección les compete." ([5]) De ello se sigue que las reglas y normas de contratos, entre ellas el mutuo disenso, son inaplicables al

---

([4]) Aunque si acumula capital tampoco podrá oponer su derecho de privacidad a la distribución entre los que contribuyeron a su formación; ni a las obligaciones para con los hijos que vinieren.

([5]) Giménez Fernández, *La Institución Matrimonial,* según citado por Castán, *Derecho Civil Español*, Tomo 5°, Vol. 1°, pág. 73, Octava Ed. (1960).

matrimonio. (⁶) Quien de su libérrima voluntad se adhiere a este conjunto institucional de reglas impuestas por el Estado en torno al matrimonio que es base y condición de la convivencia civil, mal puede invocar un derecho de intimidad oprimido. Sus actos propios de aceptación de un diseño jurídico y moral para fundar su familia son impedimento legal para una subsiguiente repudiación del régimen legislado. Si el derecho de privacidad del individuo por el solo fundamento de vivir bajo un régimen de ley, cede ante la orden fundada de registro de su persona y propiedad, no encontramos mérito ni fundamento jurídico en la pretensión de unos cónyuges de mantener su derecho de intimidad inmune e intacto, aun después de haberse abrazado en afirmación solemne a la institución del matrimonio. Tanto en uno como en otro caso patentes razones de orden y de moral pública colocan el interés social sobre la conveniencia personal.

## II

### DE LA FACULTAD DEL INDIVIDUO PARA CREARSE UNA CAUSA DE ACCIÓN DE DIVORCIO

El interés apremiante del Estado en la conservación y estabilidad de la familia, y en el cuidado, protección y educación de los hijos que aseguren la continuidad de la especie y de la nación, es absorbente de toda conveniencia personal de los cónyuges dictada por su peculiar criterio de vida íntima. Una vez usado el ariete del derecho a la vida íntima para disolver instituciones del Derecho Civil nos colocamos en una ruta de abolición de la civilización sin final previsible. El derecho de intimidad que no tolera una espera de dos años para el divorcio, eventualmente se invocará para anular las demás obligaciones familiares como la patria potestad, la adopción y hasta los ordenamientos sucesorales. Significaría

---

(⁶) Puig Brutau, *Fundamentos de Derecho Civil*, Tomo 4, Vol. 1º, pág. 27 (Ed. 1967) ; Castán, *op. cit.*, pág. 72.

el entronizamiento de la anarquía en el Derecho Privado impuesta por la solución caprichosa que cada pareja escoja para en común acuerdo crearse un mundo sin obligaciones. Una vez reconocido el derecho de las partes a repudiar el matrimonio, sin ley que expresamente lo autorice, nada puede oponerse a que repudien la relación paterno-filial si ésta hiere su derecho de intimidad. La decisión coloca la civilización y especialmente los valores morales y éticos de la familia en curso de retroceso hacia la jungla y las cavernas.

La mayoría propicia un desarrollo anómalo del derecho a la vida íntima en detrimento de instituciones que son pilares de civilización. El derecho de intimidad es el máximo recinto de la libertad individual, pero de una libertad ordenada por normas de vida comunitaria bajo un régimen constitucional. No es la libertad del anarquismo, que en su prédica de libre albedrío y de imposición absoluta de su voluntad, sin freno ni moderación de fuente alguna, termina por hundir la libertad en el caos. Una vez iniciada la estampida del derecho de intimidad contra las instituciones de Derecho, no hay límite visible a su devastación. Hoy es la institución del matrimonio, mañana la patria potestad y custodia, luego las reglas sucesorales y las de contratación privada. ¿En qué relación entre personas no hay un elemento de vida íntima afectado que no pueda invocarse para deshacer lo acordado y para cambiar a gusto el estado de derecho? La decisión de hoy alimenta una escuela de pensamiento que sostiene que la humanidad degradada se gobierna y dirige por sus intereses y vicios, antes que por sus afectos y virtudes. No fue ése el criterio dominante entre los autores de las dos Constituciones que rigen nuestra vida, como no es el camino de la libertad desenfrenada el que asegura la duración de las libertades que hoy disfrutamos. La Constitución debe interpretarse como lo que en esencia es, un instrumento de garantía de la libertad dentro de una sociedad civilizada gobernada por leyes que la Rama Legislativa, no los individuos, promueve y adopta. El día que la

espada simbólica que es la propia fuerza de la Constitución se convierta en martillo de demolición de las leyes del pueblo, estaremos asistiendo a las exequias del sistema de separación e independencia de poderes y al inaceptable traslado del poder legislativo a la rama judicial. El experimento que hoy se propone, sin precedente ni aun en las naciones totalitarias que han reservado a sus cuerpos legislativos la reglamentación del divorcio, de crear una causal general de disolución del matrimonio basada en la voluntad de las partes, es tan cruda invasión del campo legislativo en su función universal de reglar las instituciones de Derecho, que deja en precario el estatuto personal de los puertorriqueños ante el mundo.

Este Tribunal no debe renunciar a su función vital de declarar el derecho que en última instancia imparte eficacia al estatuto aprobado por la Legislatura. Se acepta generalmente que ésta es una participación legítima del Tribunal Supremo en el proceso legislativo. Pero una cosa es participar y otra suplantar y aquí se incurre en vicio al originar legislación. Con ello se desnaturaliza la distribución de poder entre la Rama Legislativa y la Judicial y nos dedicamos a legislar sin los instrumentos de estudio, vistas públicas y determinación de consenso entre los ciudadanos que caracterizan el proceso legislativo alrededor de todo proyecto trascendental. A la dificultad básica de impropio ejercicio del poder que la Constitución asigna a funcionarios elegidos en comicios, se añade la final frustración de cómo implementar procesalmente lo creado. Se invierte y disloca el esquema que deja en la Asamblea Legislativa la aprobación de las leyes, y en los tribunales la de aprobar las reglas.

La Ley es el signo externo de la moral de un pueblo. Mediante la institución del matrimonio y su reglamentación la sociedad se adentró en la civilización y se alejó de la barbarie de la promiscuidad en que se cumplía el impulso reproductor de la especie sin más aliciente que el instinto que dirige los animales. Así ocurría entre las primitivas tribus

guerreras en que la noción de paternidad y filiación se perdía en la concupiscencia de soldados fecundando mujeres al azar porque al Estado sólo le interesaba asegurar una continua producción de hombres para la lucha. En el decurso del tiempo el Estado civilizado dejó atrás aquellas costumbres, se irguió el hombre con principios de moral y ética paradigmas del raciocinio, y creó la familia alrededor del matrimonio como base de la estructura social. Para ello le quitó a aquella cópula primitiva y bárbara el elemento de libre albedrío en los partícipes. No veo razón para restaurar en nuestros días el mutuo consentimiento, sin guía de legislación que le imparta la aceptación moral de nuestra sociedad, como único factor determinante de la subsistencia de la institución familiar. Los derechos constitucionales, como los grandes ideales y sentimientos del ser humano, no están exentos de una interpretación que los reduzca a lo absurdo. El autor del drama siempre está a merced de los actores. Percibo esa bifurcación decadente en el nuevo giro con el que haciendo abstracción de la Ley según declarada por nuestra Asamblea Legislativa, en arranque de morbidez intelectual intentamos darle una ley al país que delega en el derecho de intimidad incontrolado de las partes la decisión de regresar a aquella privacidad de las tribus guerreras. La opinión de la mayoría no sólo hiere el principio de separación de poderes, sino que enfila la Constitución en una senda de disolución del orden público legislado y de los conceptos morales que la legislación encarna resultante todo ello en falta de certeza y estabilidad en el orden jurídico. La flagrante incursión por este Tribunal en el sensitivo campo de la moral que orienta la política pública de la Legislatura en materia de matrimonio es signo ominoso en nuestra democracia. ¿Cuál será la institución civil en turno de caer, sacrificada por la conveniencia personal de alguien, en el curso de alquimia constitucional que hoy iniciamos? Los padres de la Constitución se revuelven en sus tumbas cuando asoma la "oligarquía togada" como usurpadora de la

voluntad del pueblo, desplazando sus representantes electos. La ruta de abolición de la línea entre la voluntad privada y el interés público que no es otra cosa que la pluralidad de voluntades dirigidas al mayor bienestar del conjunto en comunidad, ahora sometido a inesperada erosión por el Poder Judicial, no tiene horizontes visibles. *Quosque tandem?*

## III

### EL FANTASMA DE LA CULPA EN EL DIVORCIO

Contra la deshumanización de las relaciones familiares más allá del punto de colapso interno del matrimonio, agravada por los obstáculos de recriminación, connivencia y colusión en el proceso de divorcio, surgen voces de eco de Nemesio Canales[7] que arranca de expresiones hechas en 1915, con aparente abstracción del cambio radical introducido por legislación en la novena causal, convertida hoy en asequible instrumento para la disolución del vínculo, sin la farsa, ni la angustia, ni la ventilación pública de tragedias íntimas. Después de su más reciente enmienda por Ley Núm. 101 de 2 junio, 1976 dicha causal está formulada así:

Las causas del divorcio son:

" . . . . . . . .

"(9) La separación de ambos cónyuges por un período de tiempo sin interrupción de más de dos años; Disponiéndose que probado satisfactoriamente la separación por el expresado tiempo de más de 2 años, al dictarse sentencia no se considerará a ninguno de los cónyuges inocente ni culpable." 31 L.P.R.A. sec. 321.

Que al así actuar la Asamblea Legislativa atendió la protesta de Canales y aun las voces más recientes, surge inequívocamente de las siguientes expresiones en la Exposición de Motivos de la referida Ley Núm. 101 de 1976:

---

[7] Paliques LXXI, Ediciones Isla, San Juan (1967), pág. 173, incorporado a la opinión concurrente del Juez Rigau en *Pueblo* v. *Tribunal Superior*, 99 D.P.R. 30, 38 (1970).

"El matrimonio es una relación tan íntima entre dos personas que, cuando se quebranta al extremo de disolverse, en muy raras ocasiones puede asegurarse que uno solo de los cónyuges fue el 'culpable' y el otro el 'inocente'. Esta situación es prácticamente inexistente cuando la causal del divorcio es la de separación.

Cuando el esposo y esposa se separan y luego de dos años de permanecer en ese estado, solicitan un divorcio la situación real corresponde más bien al hecho de que ambos entienden que su matrimonio no puede subsistir."

La adoptada por nuestra Legislatura es la solución ecléctica entre la festinada disolución por mutuo acuerdo y la opresión de las causas tradicionales de divorcio, y responde a los usos y costumbres y a las aspiraciones morales y éticas de este pueblo. El Gobierno, sus legisladores, ejecutivos y jueces sientan ejemplo de conducta colectiva y son los principalmente llamados a proteger la virtud y la honestidad y a preservar una cantidad mínima de decencia compatible con la civilización. Las leyes son la expresión externa de la moral de un pueblo, y la Asamblea Legislativa de Puerto Rico tiene una respetable tradición de adhesión a ese principio que no ha de sufrir la intromisión del poder judicial. Con el nuevo y avanzado texto de la novena causal de divorcio quedan atrás los argumentos de principio de siglo y se tornan obsoletos los reclamos de privacidad. No es éste el caso único donde se invoca ese derecho como palio de laxitud y desorden; con igual entusiasmo reclamó agravio de su derecho de intimidad en el automóvil que había hurtado, el acusado que pretendió excluir la evidencia incriminante. *Pueblo* v. *Vargas Delgado*, 105 D.P.R. 335 (1976). Sobre el problema se ha expresado el Prof. W. Friedmann: [8]

"En forma abrumadora el Mundo Occidental, aún hoy día, rechaza el concepto del matrimonio como análogo a un contrato corriente. Con ello está implícito el rechazo de la teoría del divorcio por simple consentimiento. Hay, sin lugar a duda, considera-

---

[8] *Law in a Changing Society*, págs. 222–223.

ble justificación para el criterio de que la disponibilidad del divorcio por consentimiento tentaría las parejas de casados a inflar un desacuerdo, incomodidad u otra dificultad pasajera, en un fracaso rotundo. La larga experiencia demuestra que la paciencia, la perseverancia y la progresiva madurez pueden remediar muchas situaciones que en la agonía del momento parecen insuperables. También en muchos casos, aunque no siempre, resultará cierto que el bienestar de los hijos será mejor servido por la preservación del matrimonio, que por el impacto de la separación. Pero el efecto desmoralizante de la relación diaria con padres alienados y amargados, que a menudo envuelven los hijos en sus conflictos, será mucho más dañino. De todos modos, el contraste entre la teoría legal y la realidad social es hoy, en muchos Estados, peligrosamente amplio. La ley de divorcio, se ha convertido, en mayor o menor grado, en burla a través del mundo Occidental moderno. Ni hay la más mínima evidencia en la condición social, económica o moral de la sociedad Occidental, sobre la cual presumir que el mantenimiento de una ley estricta conducirá a un cambio en la realidad fáctica.

Un posible compromiso entre estas consideraciones antagónicas aparece en el derecho de cualquiera de los cónyuges a obtener el divorcio basado en que él o ella ha vivido separado del otro cónyuge por un período específico." (9)

La vigente novena causal de divorcio satisface a plenitud el valioso criterio de Friedmann. La Asamblea Legislativa que con la marcha del tiempo ha ido ajustando el término de separación desde 7 años en su origen, hasta 2 años al presente, y eliminado todo vestigio de recriminación y adjudicación de culpa, es la llamada a reformar la ley cuando así lo decida esta sociedad, protegiendo la dignidad de la institución del matrimonio de teorías disolventes prohijadas por los partidarios de una laxitud que no refleja necesariamente la tradición de moral de este pueblo. La insistencia dogmática en la libertad como único valor a ser protegido por el Gobierno

---

(9) Una forma de reconocer el principio de colapso (*breakdown*) se manifiesta en el poder para disolver el matrimonio sobre la base de que los cónyuges han estado separados por determinado período. *Friedmann, ibid.*, pág. 213.

menosprecia tales cosas como la sobrevivencia, y las tradiciones comunitarias esenciales para sobrevivir.

Mi preferencia por un divorcio por consentimiento autorizado por ley que proteja tanto a los cónyuges como a los hijos, de divorcios irreflexivos, no me inclina a sacar este asunto del ámbito legislativo, y a respaldar la creación por este Tribunal de una nueva causal, sin normas ni reglas procesales, sobre el filo de un mal entendido derecho de intimidad, sin guía para los tribunales proteger el interés de los hijos, convertidas las salas de justicia en agencias de rápido despacho de divorcios sobre el mostrador, con un procedimiento sui generis que podrá variar según el criterio particular que cada juez se forme sobre la manera de administrar este divorcio íntimo coartado a cada paso por un planteamiento de privacidad. ¿Acaso no tiene el cónyuge un derecho de privacidad en el escamoteo y ocultación de los bienes gananciales? Parece que cambiamos una farsa por una comedia.

La opinión de la mayoría resume a la pág. 275 la justificación de su *ratio decidendi* en la siguiente pregunta: "¿Qué interés social exige que como precio para obtener el divorcio las partes tengan que acordar fingir un pugilato legal, revelar detalles íntimos de su vida familiar o acudir al perjurio y el engaño, en lesión de su dignidad y de la majestad de la ley?" La pregunta parece hecha en otro tiempo y lugar pues la novena causal no exige tal precio. Igual inconsistencia en el análisis refleja la invocación de las Secs. 1 y 8 del Art. II de la Constitución contra "causales derivadas del concepto de culpa." Despojada la novena causal de tal elemento recriminatorio, ¿qué necesidad real hay de acudir al método extremo de declarar inconstitucionales los Arts. 68, 95 y 97 del Código Civil que para nada intervienen con el divorcio fundado en dicha causal de separación? El Tribunal se ha embarcado en la aventura académica de usar su más prestigioso poder en un gesto innecesario, fuera por completo del

marco y de la cuestión justiciable sometida para decisión. Echa a perder su experimento legislativo con la expresión vacía de que "nada de lo anterior significa que el divorcio es asunto exclusivo de las partes, sujeto a su puro capricho y antojo." ¿Con qué instrumento de ley puede evitarse la anticipada catástrofe? ¿Olvida el Tribunal que el derecho a la intimidad también cubre el capricho y antojo?

Ya al final, en la opinión mayoritaria aflora la inseguridad estructural y jurídica de la solución escogida y se vuelve hacia la Asamblea Legislativa autorizándola a "erigir otras salvaguardas." Terminó el vuelo imaginativo y regresamos a la correcta perspectiva aprisionada en palabras del propio Juez Presidente:

"Lo anterior no justifica que en aras de corregir una situación considerada indeseable nos abrogásemos los jueces un poder que la Constitución ha depositado en otra rama del gobierno. El deseo de satisfacer los reclamos de reforma del pueblo no nos autoriza a traspasar los límites que al ejercicio de nuestra autoridad ha impuesto el mismo documento que nos la otorga. La Constitución es la expresión más solemne de la voluntad del pueblo y a sus preceptos debemos lealtad absoluta, aun cuando esa lealtad nos obligue a abstenernos de formular una norma que consideremos apropiada o incluso, indispensable." *In re Rodríguez Torres* (En reconsideración), 106 D.P.R. 698 (1978).

En este caso una mayoría de jueces de este Tribunal rehusó mantener en vigor un pronunciamiento de ética relativo a la conducta de abogados legisladores en puntillosa abstención de toda intervención con el campo legislativo, en asunto de menor trascendencia sobre el cual la Legislatura había expresado una básica concurrencia con el criterio ético recogido en la norma derogada. En el reciente caso de *Vermont Yankee Nuclear Power Corp.* v. *NRDC*, 435 U.S. 519, 557 (1978) donde la cuestión vital, de inmediato riesgo para un considerable número de seres humanos, era la autorización y ubicación de una planta de energía nuclear, el Tribunal Supremo de los Estados Unidos detuvo la intervención judicial

en las cuestiones de política pública fundamental, con este lenguaje:

"La energía nuclear puede algún día ser la fuente barata y segura de fuerza, o puede que no lo sea. Pero el Congreso ha elegido por lo menos probar con la energía nuclear, y para ello ha establecido un razonable proceso de revisión en el que los tribunales tienen un rol limitado. Las cuestiones fundamentales de política pública propiamente resueltas en el Congreso y en las legislaturas estatales *no* están sujetas a reexamen en las cortes federales bajo el pretexto de revisión judicial de la actuación de una agencia. El tiempo podrá demostrar que fue errónea la decisión de desarrollar la energía nuclear, pero son el Congreso o los Estados a través de sus correspondientes agencias los que eventualmente han de hacer esa determinación. Mientras tanto, los tribunales deben remitirse a sus funciones asignadas. . . . [El mandato de la Ley de Política Ambiental Nacional (NEPA) a las agencias] va dirigido a asegurar una decisión plenamente informada y bien ponderada, que no es necesariamente la decisión que los jueces de la Corte de Apelaciones o de esta Corte hubiesen adoptado de haber sido miembros de la unidad decisional de la agencia."

Si tal es la deferencia de este Tribunal y la del Supremo Federal al Poder Legislativo, traducida en terminante principio de abstención, en asuntos comparativamente leves como una norma de ética y la decisión sobre ubicación de un reactor nuclear, mayor ha de ser el respeto al criterio legislativo cuando está envuelta la política pública en torno a la institución del matrimonio, "fundamento y base necesaria de la familia, y, a la vez, condición primaria de la sociedad civil." ([10])

Con estos precedentes y fundamentos, revocaría la sentencia apelada.

---

([10]) Castán, *op. cit.*, pág. 75.